## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **JOE BEASLEY, VINCENT FORT,** | : | |
| **LILIANA BAKHTIARA, JASON** | : | |
| **WOODY, MELVIN SMITH, JOE DIAZ,** | : | |
| **and OCCUPY ATLANTA,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **CIVIL ACTION FILE NO.** |
| **v.** | : | **1:11-CV-03801-AJB** |
| | : | |
| **CITY OF ATLANTA,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>ORDER AND OPINION</u>[1]

Before the Court is Defendant's motion to dismiss Plaintiffs' second amended complaint. [Doc. 36]. For the reasons below, the motion is **GRANTED** and Plaintiffs' action is **DISMISSED**.

## I.      Relevant Procedural History

On November 4, 2011, Plaintiffs filed suit against Defendant City of Atlanta for alleged violations of the First Amendment to the United States Constitution, [Doc. 1], and the case was assigned to District Judge Timothy C. Batten, Sr., [Doc. 4 at 1].

---

[1]      The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. [Doc. 31].

AO 72A
(Rev.8/8
2)

Plaintiffs also filed an emergency motion for temporary restraining order and preliminary injunction. [Doc. 3]. Judge Batten held a hearing on the motion, [Docs. 7 (Minute Sheet), 20 (Transcript)], and denied the motion, [Doc. 6]. On December 9, 2011, Defendant filed a motion to dismiss Plaintiffs' complaint. [Doc. 15]. On December 27, 2011, Plaintiffs filed an amended complaint pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, [Doc. 17], along with a response to the motion to dismiss, [Doc. 18]. On January 13, 2012, Defendant filed its reply. [Doc. 25]. On January 26, 2012, the parties consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. [Doc. 31].

On February 1, 2012, the undersigned—noting that the filing of the amended complaint mooted the December 9, 2011, motion to dismiss—denied the December 2011 motion to dismiss as moot, directed Plaintiffs to file a second amended complaint that included exhibit labels, and directed Defendant to file a motion to dismiss the second amended complaint, if it so chose. [Doc. 32]. Plaintiffs timely filed the second amended complaint on February 8, 2012, [Doc. 34], and the motion to dismiss the second amended complaint ("motion to dismiss") was timely filed on February 22, 2012, [Doc. 36]. The response to the motion to dismiss was filed on

2

March 7, 2012, [Doc. 37], and the reply in support of the motion to dismiss was filed on March 23, 2012, [Doc. 38].  With briefing completed, the motion to dismiss is ready for resolution.

## II.    Facts

"At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999); *see also Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007) (noting that all allegations in the complaint are to be taken to be true even if doubtful in fact).  The Court is not required to accept Plaintiffs' legal conclusions, however.  *See Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Nor will the Court "accept as true a legal conclusion couched as a factual allegation."  *See Twombly*, 550 U.S. at 555. The statements set forth below are not factual findings by the Court; they are taken as true solely for the limited purpose of adjudicating this motion to dismiss.

With these principles in mind, the undersigned turns to the facts of this case, as set out in Plaintiffs' second amended complaint.

AO 72A
(Rev.8/8
2)

***The Parties***

Plaintiff Joe Beasley is a military veteran and civil-rights leader, as well as the human-resources director at the Antioch Baptist Church, president of the Joe Beasley Foundation, and the southern regional director of the Rainbow/PUSH coalition. [Doc. 34 (Second Am. Compl.) ¶ 3]. He participated in the Occupy Atlanta protests—described further below—and was arrested at the protests on October 26, 2011. (*Id.*).

Plaintiff Vincent Fort is a state senator for Fulton County's 39th District. (*Id.* ¶ 4). He participated in the Occupy Atlanta protests "several times each week" and was arrested at the protests on October 26, 2011. (*Id.*).

Plaintiffs Liliana Bakhtiara, Jason Woody, Melvin Smith, and Joe Diaz are adult Georgia residents, and each participated in the Occupy Atlanta protests. (*Id.* ¶ 5). The Second Amended Complaint does not indicate that they were arrested. (*See id.*).

Plaintiff Occupy Atlanta

is an unincorporated organization consisting of individuals who voluntarily join to voice their disagreement with governmental policies that create ongoing political and social disenfranchisement of the American populace, to combat inequitable concentrations of power and wealth, and to enact policies and laws based upon the fundamental principle of absolute respect for all people.

4

(*Id.* ¶ 6).

Defendant City of Atlanta ("the City") is a municipal corporation incorporated under the laws of the State of Georgia.  (*Id.* ¶ 7).

### Background of the "Occupy" Movement and Occupy Atlanta

The movement now known as Occupy Wall Street began in September 2011 in New York City.  (*Id.* ¶ 8).  As described by Plaintiffs,

> [t]he goal of the movement was to protest and end growing wealth disparity in the United States, the disenfranchisement of the poor and middle class, and to combat systemic discrimination based upon race, sex, gender, class, nationality, and sexual orientation. The Occupy Wall Street movement garnered international attention and similar protests have begun in various cities across the United States and the world.

(*Id.* ¶ 8).  According to Plaintiffs, the groups within the "Occupy" movement, including Occupy Atlanta, maintain a twenty-four-hour presence on a specific parcel of public property and engage in what Plaintiffs deem to be protected speech and assembly during that time.  (*Id.* ¶ 13).  Plaintiffs contend that the use of twenty-four-hour protests "is one of the fundamental and distinguishing characteristics of the Occupy movement. Without such protests, individuals associated with the movement will be deprived of the most effective means of assembling and communicating their political message." (*Id.* ¶ 14).

5

Occupy Atlanta "is a direct outgrowth of the Occupy Wall Street movement and adheres to the same principles and political message." (*Id.* ¶ 9). It is governed by a general assembly that is driven by consensus decisionmaking pursuant to established procedures. (*Id.* ¶ 12). Occupy Atlanta's purpose "is to voice political concerns, to provide an avenue of political speech, and to encourage political participation and awareness by its members and the general public." (*Id.* ¶ 9). It is committed to peaceful protests and does not tolerate "any form of violence, discrimination, waste, or public nuisance." (*Id.* ¶ 10). "Occupy Atlanta leaders" have stated publicly that violence and law-breaking will not be permitted, and several members of the organization have been tasked with ensuring that the protests remain peaceful and lawful. (*Id.* ¶ 11).

### *Occupy Atlanta in Woodruff Park*

On October 6, 2011, individuals associated with Occupy Atlanta began protests in Woodruff Park ("the Park") in Atlanta. (*Id.* ¶ 15). According to Plaintiffs, "Woodruff Park is centrally located in downtown Atlanta and is accessible by both bus and train. The Park is blocks away from Georgia State University and during the day is thriving with students and business workers. Woodruff Park is also within walking distance of the Georgia Capitol building." (*Id.* ¶ 16). The protests quickly grew; they

6

"were focused on voicing political concerns, advancing the political causes of the Occupy movement and, at all times, focused on providing an avenue for the free expression of political ideas and a common point of assembly for interested citizens." (*Id.* ¶ 17).  Each night, a number of individuals remained in Woodruff Park overnight to maintain the protests.  (*Id.* ¶ 18).  Those who remained in the park maintained a quiet presence and "did not disrupt any nearby road, thoroughfare, business, apartment, or public facility."  (*Id.*).  Activities continued through the night, and individuals assembled to participate in the free expression of ideas.  (*Id.*).

### *Atlanta Regulation on the Use of Public Parks*

There are at least 343 public parks within the City of Atlanta.  (*Id.* ¶ 48).  The Code of Ordinances of the City of Atlanta ("Code") provides for a process by which organizers can apply for various permits allowing them to engage in various activities in and around public parks—for example, an outdoor-festival permit, a large-gathering permit, an assembly permit, a street-closure permit, and a sidewalk-closure permit.  *See* Code Sections 142-103, 142-81, (Exhs. A & B to Second Am. Compl., [Doc. 34-2 at 2, Doc. 34-3 at 2]); *see also* City of Atlanta, GA: Office of Special Events, http://www.atlantaga.gov/index.aspx?page=134 (noting that the Mayor's Office of

7

Special Events permits three types of outdoor events: assemblies, large gatherings, and outdoor festivals) (last visited Aug. 30, 2012).[2]

Most relevant to this lawsuit, the Code further provides that

No person shall be in any park or upon any park lane or park drive between the hours of 11:00 p.m. and 6:00 a.m. daily, except that the hours for use of the Chastain Park amphitheater are extended until 1:00 a.m. on nights when performances are being given in the Chastain Park amphitheater as provided in section 110-59(c), or except if the person has a festival or assembly permit for consecutive days and is performing duties not possible during the normal festival or assembly hours.

Code Section 110-60(a) ("Park Closure Law" or "Law"), (Exh. C to Second Am. Compl., [Doc. 34-4 at 2]).

### *Mayor Reed's Executive Orders*

Pursuant to the Code, the Mayor of the City of Atlanta has the power

[t]o issue executive orders which may apply to events of short duration, including, but not limited to, the temporary exercise of extraordinary police power in times of emergency, such action to expire at the next meeting of the council subsequent to the issuance thereof unless ratified by a majority of the council present and voting.

Code Section 2-182, (Exh. D to Second Am. Compl., [Doc. 34-5 at 2]).

---

[2]     No outdoor event that is not an "assembly" (defined as, among other things, a group that moves from one location to another, *see* Code Section 142-81(a)(1), (Exh. B to Second Am. Compl., [Doc. 34-3 at 2])) and that has an expected attendance of fewer than seventy-five people requires an outdoor-event permit. Code Section 142-101, (Exh. A to Second Am. Compl., [Doc. 34-2 at 2]).

8

On October 10, 2011, City of Atlanta Mayor Kasim Reed spoke favorably of Occupy Atlanta. (Second Am. Compl. ¶ 25). On October 12, 2011, he issued Executive Order ("EO") 2011-2, which noted that because of the Occupy movement's strategy of demonstrating indefinitely and resuming protests even after arrests, and because Occupy Atlanta's website states that protesters are unwilling to leave Woodruff Park after 11:00 p.m. and are prepared to be arrested for that infraction, enforcing Woodruff Park's closure during the Occupy Atlanta demonstration would cause the City to exhaust limited resources on a nightly basis. EO 2011-2, (Exh. E to Second Am. Compl., [Doc. 34-6 at 2-3]). He therefore found a "compelling public safety need" to suspend enforcement of the Park Closure Law, but he noted that "the compelling need exists only during such time as Occupy Atlanta remains in the Park and such time as the Movement provides actual evidence of its commitment to demonstrate indefinitely and resume demonstrations after arrest." *Id.*, [Doc. 34-6 at 3]. He stated that the EO would be in effect until October 17, 2011 (the date of the next full City Council meeting). *Id.*

On October 17, 2011, Mayor Reed issued EO 2011-3, which contained similar language and which extended the suspension of the Park Closure Law through November 7, 2011 (the date of the next full City Council meeting) "or until I determine

that the compelling need to suspend enforcement no longer exists and accordingly nullify this Order." EO 2011-3, (Exh. F to Second Am. Compl., [Doc. 34-7 at 2-4]).

While these executive orders were in place, City police nevertheless "maintained a presence surrounding the Occupy Atlanta movement." (Second Am. Compl. ¶ 29).

On October 25, 2011, Mayor Reed issued EO 2011-4, revoking EO 2011-3. EO 2011-4, (Exh. G to Second Am. Compl., [Doc. 34-8 at 2-3]). In that Order, the Mayor indicated that "individuals in Woodruff Park have not adhered to fire safety laws and directives critical to public safety and have created a substantial and immediate public safety risk," which he believed "require[d] the immediate revocation of [EO] 2011-3." *Id.*, [Doc. 34-8 at 2]. Thus, he directed that the Park Closure Law be enforced. *Id.*, [Doc. 34-8 at 3].

### *Subsequent Arrests and Protests*

On October 25, 2011, City police announced their intention to arrest anyone who remained in Woodruff Park after 11:00 p.m. (Second Am. Compl. ¶ 32). To prepare for the arrests, City police erected barricades around the perimeter of Woodruff Park. (*Id.* ¶ 33). Between 200 and 300 uniformed City police officers were involved in the effort to evict all individuals from Woodruff Park. (*Id.*). On October 26, 2011, (*see id.* ¶ 36), approximately fifty-two peaceful individuals were arrested, (*id.* ¶ 34). The

10

police removed all personal possessions of the protesters and threatened to arrest any individual who re-entered Woodruff Park.   (*Id.*).   Woodruff Park remained closed—surrounded by barricades and a heavy police presence—through October 27, 2011.  (*Id.* ¶ 35).

All Occupy Atlanta protesters who were arrested on October 26 were charged with violating the Park Closure Law. (*Id.* ¶ 36).  They "were not charged with violating any other law of the State of Georgia or City of Atlanta by peacefully assembling in Woodruff Park."  (*Id.* ¶ 37).

After the October 26 arrests, Occupy Atlanta announced its intent to resume protests in Woodruff Park on November 5, 2011.  (*Id.* ¶ 38).

On the evening of November 5, 2011, numerous protesters gathered in Woodruff Park, erecting tents and signs.  (*Id.* ¶ 39).  At approximately 11:00 p.m., the protesters left the park and moved to the surrounding sidewalks.  (*Id.* ¶ 40).  Police in riot gear "paraded up and down Peachtree Street" and closed numerous side streets. (*Id.* ¶ 41). "The vast majority [of] protesters remained on the sidewalks, and the police arrested protesters who stepped onto the street or for other technical violations of the law." (*Id.*). There were a total of twenty arrests, in spite of the fact that the protesters left the park

11

at 11:00 p.m. and engaged in protest on the sidewalks surrounding the park.  (*Id.* ¶ 42).[3]

The congregation and protests on the sidewalks was short lived, and by 2:00 a.m., the

protesters dispersed.  (*Id.* ¶ 43).

On November 6, 2011, a single protester entered Woodruff Park and sat in silent

protest.  (*Id.* ¶ 44).  City police arrested this protester for remaining in a public park

after 11:00 p.m.  (*Id.* ¶ 45).

## III.    Motion-to-Dismiss Standard

A court will grant a Rule 12(b)(6) motion to dismiss if the complaint "fail[s] to

state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Under Rule 8

of the Federal Rules of Civil Procedure, a pleading states a claim when it contains, *inter*

*alia*, "a short and plain statement of the claim showing that the pleader is entitled to

relief."  Fed R. Civ. P. 8(a)(2).  To determine whether a complaint fails to state a claim,

the Court must apply the standard announced by the Supreme Court in *Bell Atl. v.*

*Twombly*, 550 U.S. 555 (2007), described as follows:

> [T]he pleading standard Rule 8 announces does not require detailed
> factual allegations, but it demands more than an unadorned,
> the-defendant-unlawfully-harmed-me accusation.  A pleading that offers
> labels and conclusions or a formulaic recitation of the elements of a cause

---

[3]      The Second Amended Complaint does not indicate the laws under which
these individuals were charged.

12

of action will not do.  Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

Two working principles underlie our decision in *Twombly*.  First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . .  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.  Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (alterations, citations, and internal quotation marks omitted).

## IV.   Discussion

In their second amended complaint, Plaintiffs allege three First Amendment violations, through 42 U.S.C. § 1983.  Specifically, they contend that: (1) Code Section 110-60 (the Code section containing the Park Closure Law) is an

13

impermissible time, place, and manner restriction on its face and as applied (Count One); (2) Code Section 110-60 is unconstitutionally overbroad (Count Two); and (3) the ability of the Mayor to suspend enforcement of Code Section 110-60 to allow for after-hours speech and protest constitutes an unlawful prior restraint (Count Three).  (Second Am. Compl. at 13-15).[4]  The City contends that: (1) the Park Closure Law is a content-neutral restriction that lawfully regulates time, place, and manner of speech; (2) the Park Closure Law is not overbroad; (3) EO 2011-3 was not a permit that authorized a particular form of speech; and (4) EO 2011-4 was issued to alleviate compelling and immediate public-safety risks.  [Doc. 36 at 7, 19, 21, 23].

The First Amendment to the United States Constitution states in relevant part that "Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. Const. amend. I.  Although the First Amendment only refers to "Congress," *id.*, it applies to state and local governments as well.  *See McKinley v. Kaplan*, 262 F.3d 1146, 1147 n.1 (11th Cir. 2001) (citing *Wallace v. Jaffree*, 472 U.S. 38, 49 (1985)).  To bring the constitutional claims alleged in Plaintiffs' Second Amended Complaint, Plaintiffs

---

[4]     The Court agrees with the City's contention, [Doc. 36 at 9 n.2], that although the Second Amended Complaint references both Code Section 110-60 generally and Code Section 110-60(a) specifically, this case only involves Code Section 110-60(a).  The Court will thus only address that provision.

14

cannot proceed directly under the First Amendment.  Instead, Plaintiffs must assert their

claims through 42 U.S.C. § 1983.  *See Almand v. DeKalb Cnty.*, 103 F.3d 1510, 1512-

13 (11th Cir. 1997) ("Section 1983 creates no substantive rights; it merely provides a

remedy for deprivations of federal statutory and constitutional rights.").  Section 1983

states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State . . . , subjects, or causes to be subjected,
> any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities secured
> by the Constitution . . . , shall be liable to the party injured in an action at
> law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.[5]  To state a claim under § 1983, Plaintiffs must establish that: (1) the

City deprived them of a right secured under the U.S. Constitution; and (2) the

deprivation occurred "under color of state law." *Richardson v. Johnson*, 598 F.3d 734,

737 (11th Cir. 2010); *see also Lykes Bros., Inc. v. Architectural Review Comm'n*,

No. 93-264-CIV-T-24(C), 1994 WL 16198098, at *8 (M.D. Fla. Aug. 3, 1994) ("[T]he

conduct alleged in a section 1983 claim may give rise to liability if it occurs under color

of local law, as well as state law." (citing *Arnold v. Bd. of Educ. of Escambia Cnty.*,

---

[5]     "Municipalities can serve as a 'person' for the purposes of a suit under
§ 1983." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, ---- n.17 (11th Cir. 2012)
(citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)).

15

*Ala.*, 880 F.2d 305, 310 (11ᵗʰ Cir. 1989), *overruled on other grounds in Leatherman v. Tarrant Cnty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993))). The City has not alleged that its actions were not "under color of state law," and thus the Court considers whether the City has deprived Plaintiffs of a right secured under the U.S. Constitution. The Court therefore turns to the relevant First Amendment analysis, addressing each count in turn.

### A. Count One: Content Neutrality, Narrow Tailoring, and Alternative Channels of Communication

#### 1. Arguments of the Parties

In its motion to dismiss, the City contends that the City's Park Closure Law is a content-neutral restriction that lawfully regulates the time, place, and manner of speech and expression. [Doc. 36 at 7-19]. The City first argues that the Park Closure Law is a classic content-neutral restriction because it applies to everyone uniformly regardless of the message that is conveyed; it makes no reference to speech at all. [*Id.* at 9]. The City contends that two exceptions identified by Plaintiffs—the exception created for permit holders performing duties in a park that are not possible to perform during the actual event, and the exception created for the Chastain Park amphitheater

16

on nights when performances occur there—are content-neutral exceptions that do not transform the Park Closure Law into a content-based regulation.  [*Id.* at 10-11].

Second, the City states that the Park Closure Law is a constitutional time, place, and manner restriction.  [*Id.* at 12].  The City contends that the Supreme Court's 1984 decision in *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984), is directly on point.  As characterized by the City, the Supreme Court in that case upheld the constitutionality of a federal law prohibiting camping and overnight sleeping in two national parks in Washington, D.C., when that law was challenged by a homeless advocacy group whose members sought to sleep overnight in the symbolic tents erected by the plaintiffs in the two parks to highlight the plight of the homeless.  [Doc. 36 at 12-13].  The City states that the Park Closure Law here, like the Supreme Court found with respect to the ban in *Clark*, is narrowly tailored to meet a significant government interest and provides other means of communicating Plaintiffs' message. [*Id.* at 13].  Specifically, the City states that it has a significant interest in regulating the use of parks, for a variety of common-sense reasons, including:

> protecting the park when activity therein cannot be observed, so that the park remains in a good, safe and attractive condition; protecting the safety of those who might otherwise walk through the park at night; reducing the risk of criminal activity occurring in parks when the conduct cannot be

17

observed; and protecting neighbors surrounding parks from night-time noise that would arise from park use.

[*Id.* at 14].  The City then states that the Park Closure Law is narrowly tailored to address these significant interests, citing *Clark* and stating that the provision is limited to City parks and limited to seven hours per day, does not prevent conducting expressive activities in the Park when it is open, and does not prevent conducting expressive activities twenty-four hours per day on adjoining sidewalks.  [*Id.* at 15-17].  Finally, the City argues that the provision allows ample alternative channels for speech and expression, for some of these same reasons (the Park Closure Law disallows use of the Park for only seven hours per day, and sidewalks surrounding the Park may be used for communication without any time restriction).  [*Id.* at 18].

In response, Plaintiffs contend that the Park Closure Law is facially unconstitutional because it is not a valid time, place, and manner restriction. [Doc. 37 at 6-21].  They initially state that the message of Occupy Atlanta constitutes speech protected by the First Amendment and that Occupy Atlanta conveys its message via symbolic conduct; that the City's ban applies to a public forum; and that therefore the restriction—to survive a First Amendment challenge—must be (a) content neutral,

18

(b) narrowly tailored to serve a significant government interest, and (c) leave open ample alternative channels of communication.  [*Id.* at 6-8].

Turning to these factors, Plaintiffs first argue that the law is content based because it allows individuals to perform duties that support commercial speech while banning all other speech, assembly, and expressive conduct. [*Id.* at 8-10].  Specifically, Plaintiffs point out that while the City allows individuals to perform "duties" that cannot be performed during the day—activities that the City considers non-expressive conduct, such as erecting stages and loading merchandise—there is no similar exception for expressive conduct, such as a protest or midnight prayer vigil.  [*Id.* at 8-9].  Seen this way, Plaintiffs say, the Park Closure Law allows commercial conduct while banning expressive conduct and speech, and both the Eleventh Circuit and Supreme Court have recognized that favoring commercial speech over non-commercial speech renders an ordinance content based.  [*Id.* at 9].  According to Plaintiffs, the City offers no justification for this disparity, and a restriction on all speech while allowing other conduct is content based.  [*Id.* at 10].

Second, Plaintiffs argue that even if the Park Closure Law is content neutral, it is not narrowly tailored to serve a substantial government interest because the City's interest is limited to generic considerations related to maintaining the park and would

19

be adequately protected through far-less-intrusive means. [*Id.* at 10-15]. Plaintiffs state that the concerns cited by the City above were quoted from *Clark* and were advanced to defend a much less restrictive law. [*Id.* at 11-12]. While acknowledging that some restrictions on park use are reasonable, Plaintiffs state that a time, place, or manner restriction may not burden substantially more speech than is necessary to further the government's legitimate interests, and each of the City's claimed interests here can be addressed by enacting a more reasonable restriction. [*Id.* at 12]. For instance, Plaintiffs note that while the City argues the ban is necessary to maintain "the park when activity therein cannot be observed, so that the park remains in a good, safe and attractive condition," the City allows large festivals with hundreds of people in those same parks; allows vendors and festival workers to perform maintenance after hours; does not ban speech and assembly for seventeen hours per day, yet argues that the potential damage of after-hours speech and assembly is too great to allow any use; and does not ban tents for commercial festivals, but provides no similar exception for small protests. [*Id.* at 12-13]. Plaintiffs further note that many parks in Atlanta consist of concrete sidewalks and benches and are thus not subject to the same wear-and-tear considerations, and the speculative risk of damage caused by occasional use by small groups for speech-related activity does not justify excluding speech outright.

20

[*Id.* at 13].  Regarding an additional cited need by the City—the need to protect "the safety of those who might otherwise walk through the park at night" and to reduce "the risk of criminal activity occurring in parks when conduct cannot be observed"—Plaintiffs acknowledge that these are legitimate interests but state that these worries are not material where a group whose presence is known to the City seeks to use a specific park for a particular purpose pursuant to a valid permit, and the risk is illusory in parks that are visible from all sides.  [*Id.*].  Plaintiffs further contend that a permitting scheme would ensure legitimate use, and it is illogical for the City to argue that any sidewalk surrounding a public park can be used twenty-four hours per day while simultaneously asserting that every single person must be excluded from public parks in the interests of safety.  [*Id.* at 13-14].  Regarding a further cited need by the City—the need to "protect[] neighbors surrounding parks from night-time noise that would arise from park use"—Plaintiffs note that many protests are silent, that the City's ban on the use of parks was used to arrest and prosecute a single silent protester, and that a speculative concern about noise occurring in downtown Atlanta (and in a park

21

near Grady Memorial Hospital, Georgia State University, and the Five Points MARTA station[6]) should not be used as a pretext for silencing speech. [*Id.* at 14].

Third, Plaintiffs state that no reasonable alternative channels of communication exist because there are no other meaningful locations for late-night and multi-day speech and assembly. [*Id.* at 15-21]. Plaintiffs note two arguments advanced by the City as alternative channels of communication left open by the Park Closure Law—"[p]eople may communicate their message in the park at any time between 6:00 a.m. through 11:00 p.m.," and "sidewalks surrounding the park may be utilized for communication without any time restriction"—and address each in turn. [*Id.* at 15].

Turning first to the sidewalks argument, Plaintiffs state that while sidewalks are open twenty-four hours per day, they are not an adequate substitute for "any type of group, protest, class, vigil, meeting, or other types of speech" because Atlanta's Code prohibits obstructing a sidewalk, bans not only camping overnight but erecting tents at all, prohibits sitting or lying down on any public street, and requires a permit before one attaches a flag or banner to "any light pole or other standard erected in any right-of-way along any street," among other restrictions. [*Id.* at 15-16]. Plaintiffs also note that

---

[6]      MARTA is the Metropolitan Atlanta Rapid Transit Authority. MARTA — Metropolitan Rapid Transit Authority, http://www.itsmarta.com/ (last visited Aug. 29, 2012).

AO 72A
(Rev.8/8
2)

protests are banned "near any jail, station house, or detention facility or any city-owned property which has a policy against such assembly." [*Id.* at 16-17]. They further state that while the City's disorderly-conduct ordinance states that "no person shall be convicted of any of the following sections upon a showing that the predominant intent of such conduct was to exercise a constitutional right," this exception only prevents conviction, not arrest. [*Id.* at 17]. Lastly with respect to the sidewalks argument, Plaintiffs state that "[t]he ability to remain in a park overnight and after-hours, where signs, tents, tables, displays, and exhibits can be erected and maintained, is integral to [the] type of political expression seen in this case." [*Id.* at 18].

Turning finally to the argument that people may communicate their message at any time between 6:00 a.m. and 11:00 p.m., Plaintiffs cite a wide range of First Amendment activities that occur late at night, stating that there is no late-night public forum available for these activities in Atlanta. [*Id.* at 19-20]. They also compare the Park Closure Law to another First Amendment context—adult entertainment—stating that a municipality can restrict the operating times of adult-entertainment establishments only if it can demonstrate that the purpose is to curb negative secondary effects of the establishment, yet here the City attempts to limit peaceful assembly to certain hours based on speculative concerns and not cognizable

23

secondary effects.  [*Id.* at 20-21].  Plaintiffs argue that political protesters and peaceful demonstrators seeking permission to demonstrate in a public place deserve more First Amendment protection than that provided to nude dancing and sexual entertainment, the "outer ambit" of First Amendment protection.  [*Id.*].  They contend that it should not be difficult for the City to draft an ordinance that does not ban all speech in public parks during certain hours yet still alleviates the City's concern about keeping the parks safe and in good condition.  [*Id.*].

In reply, the City first reiterates its assertion that the Park Closure Law is content neutral.  [Doc. 38 at 1-5].  The City contends that while Plaintiffs claim that the Park Closure Law is content based because it allows festival permit holders to perform duties after-hours if they cannot be performed during the event, the decision whether to grant this after-hours exception is content neutral because the requests are always granted where the permit holder satisfies all of the permitting rules.  [*Id.* at 1-2].  According to the City, it is undisputed that implementation of the after-hours exception and the City's closing a park to the entire public at night are content neutral, and thus Plaintiffs are contending that the *existence* of the after-hours exception (as opposed to its implementation) transforms the Park Closure Law into a content-based rule, but this argument is unfounded because the after-hours conduct or speech is not "speech" for

24

First Amendment purposes. [*Id.* at 2]. The City asserts that while festivals and assemblies are constitutionally protected, the activities required to implement the events do not necessarily receive that protection; here, the City contends that "support activities"—such as bringing crafts to artists' booths or setting up stages—are not intended to convey a message (or in fact intended to be viewed at all) and thus do not receive First Amendment protection. [*Id.* at 3-4]. The City disputes Plaintiffs' suggestion that it has a different set of standards for commercial and non-commercial conduct, stating that Plaintiffs fail to mention that the support activities encompassed by the exception also support non-commercial activities such as musical performances, booths with free educational materials, and art displays. [*Id.* at 4 n.2]. Finally, the City states that Plaintiffs do not dispute that the festival permitting process is content neutral, nor do they challenge the City's decisions about which festivals may perform support activities after-hours, and they thus request that the Court reject the assertion that the after-hours exception transforms the Park Closure Law into a content-based restriction. [*Id.* at 4-5].

Second, the City argues that the Park Closure Law is narrowly tailored. [*Id.* at 5-7]. The City asserts that while Plaintiffs view the interests protected by the provision as "generic," "speculative," and "illusory," decisions of the Supreme Court

and the Eleventh Circuit have upheld the validity of the interests cited.  [*Id.* at 5].  The City states that it is not required to utilize the least-restrictive or least-intrusive means of protecting its interests, and the example alternative options proffered by Plaintiffs are not viable choices because they are content based.  [*Id.* at 6-7].  Specifically, the City contends that the proposed restriction of permitting only silent or quiet protests after-hours "jeopardizes content-neutrality" because the City would permit, for example, a non-controversial candlelight vigil but would deny (unconstitutionally) a permit for a silent protest that would likely draw angry counter-protesters; further, the City argues that the suggestion that the City, in furtherance of its public-safety interests, could enact a permitting scheme for night-time use of the Park and then exclude those people who were not participating in the permitted speech-related activity, is also unconstitutional because it would be an unlawful content-based response to the City's public-safety interests.  [*Id.*].  The City states that the Park Closure Law should be deemed narrowly tailored unless it is "substantially broader than necessary to achieve the government's interest" (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799-800 (1989)), which Plaintiffs have not shown.  [Doc. 38 at 7].

Third, the City argues that ample alternative avenues of expression exist after-hours.  [*Id.* at 7-11].  The City contends that Plaintiffs' arguments to the contrary

26

are disproved by the continued after-hours demonstrations on City sidewalks (at the time of the City's filing).  [*Id.* at 7].  The City asserts that five to ten members of Occupy Atlanta continue to demonstrate on the sidewalks abutting Woodruff Park each night, moving their tents from the Park to the sidewalks at 11:00 p.m. and moving them back into the Park at 6:00 a.m.  [*Id.* at 7-8].  The City states that although the after-hours protests dissipated, they did not disappear, and even had they done so, the relevant question is whether the City *allowed* protesters to relocate to the sidewalks, regardless whether Occupy Atlanta took advantage of that opportunity.  [*Id.* at 8 n.4].  According to the City, sidewalks are traditional public fora devoted to assembly and debate, speakers on City sidewalks can be seen and heard easily, and sidewalks abutting a park actually provide a greater opportunity for demonstrators to be noticed after-hours because it is dark and people are prohibited inside of parks.  [*Id.* at 8].  In support of its analysis, the City cites *Smith v. Fort Lauderdale, Florida*, 177 F.3d 954 (11th Cir. 1999), where the Eleventh Circuit upheld a local law limiting begging on a beach—even though the beach was a public forum and begging is constitutionally protected expression—because (as characterized by the City) the presence of sidewalks and other public fora provided alternative begging locations.  [Doc. 38 at 9-10].  Finally, the City disputes Plaintiffs' citation to various sections of Atlanta's Code,

stating that while Plaintiffs contend that Code Section 106-81 makes it a crime to block pedestrian traffic, that is actually a disorderly-conduct law that states that it does not apply to First Amendment activity, and Plaintiffs' argument that it does not prevent arrest (although preventing conviction) is specious because the City does not have the authority to arrest people for engaging in lawful conduct; further, the City states that Plaintiffs do not allege that the arrests were made in violation of Code Section 106-81. [*Id.* at 10]. With respect to Code Section 106-12—purportedly an urban camping ordinance—the City states that the provision allows people to lie down during special events, and while the exception does not explicitly state that tents are included in the exception, "any ambiguity is resolved by Plaintiffs' ability to have their tents on the City's sidewalks." [*Id.* at 11 n.6]. With respect to Code Section 138-60, providing rules for attaching flags or banners to permanent City structures such as light poles, the City states that it does not apply to people holding signs or banners. [*Id.*]. With respect to the laws prohibiting protests at private residences and protests immediately surrounding certain City facilities (Code Sections 106-89 and 106-3), the City states that Plaintiffs are not challenging the constitutionality of these laws, and the limitations of these laws are minuscule compared with the miles of City sidewalks available for First Amendment activity. [*Id.*].

28

**2.     Analysis**

In resolving Count One of Plaintiffs' Second Amended Complaint—the contention that the Park Closure Law is an impermissible time, place, and manner restriction—the Court proceeds under the following framework: "first, determining whether the First Amendment protects the speech at issue, then identifying the nature of the forum, and finally assessing whether the [City's] justifications for restricting [Plaintiffs'] speech 'satisfy the requisite standard.' " *Mahoney v. Doe*, 642 F.3d 1112, 1116 (D.C. Cir. 2011) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)); *see also Occupy Fort Myers v. City of Fort Myers*, --- F. Supp. 2d ----, ----, 2011 WL 5554034, at *4 (M.D. Fla. Nov. 15, 2011).

**a.     Whether the First Amendment Protects Plaintiffs' Speech**

There does not appear to be any dispute that the First Amendment protects the expressive activity at issue in this case.  The undersigned will therefore assume without deciding that Plaintiffs' speech is protected speech under the First Amendment.

The Court next considers the nature of Woodruff Park as a forum.

29

### b.    Nature of the Forum

" '[T]he extent to which the Government can control access depends on the nature of the relevant forum.' " *United States v. Kokinda*, 497 U.S. 720, 726 (1990) (quoting *Cornelius*, 473 U.S. at 800).  The Eleventh Circuit has explained this structure as follows:

> In order to help answer whether government property may be utilized for an expressive purpose by the general public, the courts have resorted to classifying the character of the property.  When a regulation in some way limits or bars the use of government property as a forum for expression, we begin our analysis by asking about the nature of the government property involved.  *United States v. Frandsen*, 212 F.3d 1231, 1237 (11th Cir. 2000).  Thus, the Supreme Court has broadly discerned three distinct (although not airtight) categories of government property for First Amendment purposes: traditional public fora, designated public fora, and limited public fora.  *See, e.g., Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings College of the Law v. Martinez*, --- U.S. ----, 130 S. Ct. 2971, 2984 n.11, 177 L.Ed.2d 838 (2010); *Pleasant Grove City v. Summum*, 555 U.S. 460, 129 S. Ct. 1125, 1132, 172 L.Ed.2d 853 (2009).  And, the degree of scrutiny we place on a government's restraint of speech is largely governed by the kind of forum the government is attempting to regulate.  This is so because "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647, 101 S. Ct. 2559, 69 L.Ed.2d 298 (1981).  Thus, "[t]he Government, like any private landowner, may preserve the property under its control for the use to which it is lawfully dedicated." *Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189, 1201 (11th Cir. 1991) (internal quotation marks omitted). . . .

30

>        Traditional public fora are public areas such as streets and parks
> that, since "time out of mind, have been used for purposes of assembly,
> communicating thoughts between citizens, and discussing public
> questions." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
> 460 U.S. 37, 45, 103 S. Ct. 948, 74 L.Ed.2d 794 (1983) (internal
> quotation marks omitted). . . .
>
>        A designated public forum is "government property that has not
> traditionally been regarded as a public forum" but that has been
> "intentionally opened up for that purpose." *Christian Legal Soc'y*,
> 130 S. Ct. at 2984 n.11 (quoting *Pleasant Grove City*,
> 129 S. Ct. at 1132). . . .
>
>        Finally, in the Supreme Court's nomenclature, a limited public
> forum may be established when the government limits its property "to use
> by certain groups or dedicate[s it] solely to the discussion of certain
> subjects." *Christian Legal Soc'y*, 130 S. Ct. at 2984 n.11 (quoting
> *Pleasant Grove City*, 129 S. Ct. at 1132). . . .

*Bloedorn v. Grube*, 631 F.3d 1218, 1230-31 (11th Cir. 2011).

In light of this authority, it appears that Woodruff Park is a traditional public forum. *See id.* at 1231 ("Traditional public fora are public areas such as streets and parks that, since 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' " (quoting *Perry*, 460 U.S. at 45)); *see also Perry*, 460 U.S. at 56 (describing streets and parks as "quintessential public forums"); *Naturist Soc., Inc. v. Fillyaw*, 958 F.2d 1515, 1522 (11th Cir. 1992) ("The Supreme Court and the Eleventh Circuit have

31

consistently held that parks are public forums."); *Occupy Fort Myers*, --- F. Supp. 2d at ----, 2011 WL 5554034, at *11 ("Both streets and public parks are traditional public forums.").   *But cf. Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 515 (D.C. Cir. 2010) (cautioning that "[t]he dispositive question is not what the forum is *called*, but what *purpose* it serves, either by tradition or specific designation"; "Thus, to establish that a national park (in whole or part) is a traditional public forum, Boardley must show that, like a typical municipal park, it has been held open by the government for the purpose of public discourse.").   Neither party disputes that this is so.   (*See* Second Am. Compl. ¶ 60); [Doc. 36 at 8].   The Court will therefore assume without deciding that Woodruff Park is a traditional public forum.

The Court next turns to the relevant standard.

### c.      Applicable Standard

"[A] time, place, and manner restriction can be placed on a traditional public forum only if it is content neutral, narrowly tailored to achieve a significant government interest, and 'leave[s] open ample alternative channels of communication.' " *Bloedorn*, 631 F.3d at 1231 (first alteration added) (quoting *Perry*, 460 U.S. at 45).   This standard is the heart of the dispute between the parties in this case.   The Court will consider each inquiry in turn.

32

### i.      Content Neutrality

The Court first assesses whether Section 110-60(a) is content neutral.  As stated by the Supreme Court:

> The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.  The government's purpose is the controlling consideration.  A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.  Government regulation of expressive activity is content neutral so long as it is "*justified* without reference to the content of the regulated speech."

*Ward*, 491 U.S. at 791 (citations omitted; emphasis added in *Ward*) (quoting *Clark*, 468 U.S. at 293).

The City contends that the law is content neutral because it applies to everyone uniformly regardless of the message conveyed, it makes no reference to speech at all, and the two exceptions identified by Plaintiffs—the exception created for permit holders performing duties in a park that are not possible to perform during the actual event, and the exception created for the Chastain Park amphitheater on nights when performances occur there—are themselves content neutral.  [Doc. 36 at 9-11].  Plaintiffs respond that the law is content based because it allows individuals to perform duties that support commercial speech but bans all other speech.  [Doc. 37 at 8-10].

33

The City replies that the speech encompassed within the after-hours exception is not "speech" for First Amendment purposes, and some of the support activities encompassed are non-commercial in any event.  [Doc. 38 at 2-4 & 4 n.2].

The Court agrees with the City that Section 110-60(a)—the Park Closure Law—is a content-neutral provision.  The Park Closure Law prohibits all activity in public parks from 11:00 p.m. to 6:00 a.m., without regard to the content of the prohibited speech.  No message of any kind of permitted.  *See Occupy Sacramento v. City of Sacramento*, --- F. Supp. 2d. ----, ----, No. 2:11-cv-02873-MCE-GGH, 2012 WL 2839853, at *7 (E.D. Calif. July 10, 2012) (finding public-park ordinance content neutral because it "does not make reference to prohibiting any kind of speech or expression, its prohibition against remaining in the parks after certain hours merely regulates the hours that *anyone* can remain in City parks," and it "applies to all Park users who have not obtained a permit to remain in the Park"); *cf. also Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322 (2002) ("[T]he licensing scheme at issue here is not subject-matter censorship but content-neutral time, place, and manner regulation of the use of a public forum.  The Park District's ordinance does not authorize a licensor to pass judgment on the content of speech: none of the grounds for denying a permit has anything to do with what a speaker might say.  Indeed, the ordinance (unlike

34

the classic censorship scheme) is not even directed to communicative activity as such, but rather to *all* activity conducted in a public park.  The picnicker and soccer player, no less than the political activist or parade marshal, must apply for a permit if the 50-person limit is to be exceeded.").

Plaintiffs nevertheless contend that the law is content based on the grounds that the after-hours exception permits commercial speech and no other speech, but the Court is not convinced that the after-hours activity encompassed by the Park Closure Law—which permits an individual to remain until 1:00 a.m. at the Chastain Park amphitheater on performance nights, or in any public park if the person has a multi-day festival or assembly permit and is performing duties not possible during normal hours—is necessarily commercial speech.  A festival or assembly is not inherently commercial; one can imagine numerous instances in which these events would not be. Setting up a stage for a series of free concerts is not obviously commercial, for instance, or erecting a large art display.  If it so chose, Occupy Atlanta could itself plan a large multi-day event that involved after-hours setup and take-down, for example by setting up booths for workshops, skill shares, pamphlet distribution, and other activities related to its organizational goals.  Presumably Plaintiffs would not classify that conduct as commercial, although it would have been conducted pursuant to the after-hours

35

exception of the Park Closure Law.  Because the after-hours exception encompasses both commercial and non-commercial speech, it is content neutral.  Having made this determination, the Court need not determine whether the support activities encompassed by the Park Closure Law are "speech" protected by the First Amendment.[7]

Because both the main prohibition of the Park Closure Law and its exceptions are content neutral, the undersigned concludes that the Park Closure Law is content neutral.

### ii.    Narrow Tailoring

The Court now considers whether the Park Closure Law is narrowly tailored to achieve a significant government interest.  As explained by the Eleventh Circuit:

> A narrowly tailored time, place, and manner restriction on speech does not "burden substantially more speech than is necessary" to further a significant government interest.  So long as the policy is content neutral, the restriction "need not be the least restrictive or least intrusive means of doing so."   Rather, the government need only avoid "regulat[ing] expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals."

---

[7]    Although the parties do not dispute that Plaintiffs' expressive conduct is speech protected by the First Amendment (an issue that the Court does not rule on), the City does contend that the support activities encompassed by the Park Closure Law do not receive First Amendment protection.  [Doc. 38 at 4].

36

*Bloedorn*, 631 F.3d at 1238 (citation omitted) (quoting *Ward*, 491 U.S. at 798-99).

The City argues that it has a significant interest in regulating park use, such as concerns for maintenance, noise reduction, safety, and crime reduction, and that the Park Closure Law is narrowly tailored both under *Clark* and because the provision is limited to City parks, is limited to seven hours per day, does not prevent conducting expressive activities in parks when they are open, and does not prevent conducting expressive activities twenty-four hours per day on adjoining sidewalks. [Doc. 36 at 13-17].  Plaintiffs dispute the logic of these "generic" assertions and state that these considerations could be protected through far-less-intrusive means. [Doc. 37 at 10-15].  In reply, the City defends its asserted interests as supported by Supreme Court and Eleventh Circuit precedent, contends that it is not required to utilize the least-restrictive or least-intrusive means to protect its interests, and contests Plaintiffs' proffered alternative laws as impermissible content-based restrictions. [Doc. 38 at 5-7].

The Court concludes that the Park Closure Law is narrowly tailored to achieve significant government interests.  The Court "start[s] . . . with the [City's] interests and ask[s] whether they are significant and whether the scheme avoids regulating speech in a manner that does not service its goals."  *Bloedorn*, 631 F.3d at 1238.   The

37

undersigned concludes that the City's interests in maintenance, noise reduction, safety, and crime reduction are significant government interests.  Even if "generic," as Plaintiffs contend, the interests are not invalid, because "the City is not required to present detailed evidence but is entitled to advance its interests by arguments based on appeals to common sense and logic," *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta* (*CAMP*), 219 F.3d 1301, 1318 (11th Cir. 2000) (alterations and internal quotation marks omitted).  The law at issue in *CAMP* was a festival ordinance, and the court deemed legitimate and significant the City's security and public-safety concerns.  *Id.*  The Supreme Court in *Clark* similarly found that the government's interest in the aesthetic and functional maintenance of the parks at issue in that case was substantial.  *Clark*, 468 U.S. at 296 ("[T]he regulation narrowly focuses on the Government's substantial interest in maintaining the parks in the heart of our Capital in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them by their presence."); *see also Heffron*, 452 U.S. at 650 ("[A] State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective."); *Stokes v. City of Madison*, 930 F.2d 1163, 1170 (7th Cir. 1991) ("Regulation of sound and noise, especially when competing values are threatened, has long been a recognized government interest.");

38

*White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984)

("[T]he government has a substantial interest in the preservation and enhancement of

the human environment; aesthetics are a proper focus of governmental regulation."));

*Freeman v. Morris*, No. 11-cv-00452-NT, 2011 WL 6139216, at *11

(D. Me. Dec. 9, 2011) (on motion for preliminary injunction, finding that park-closure

rule "is likely to be found a content-neutral time, place, and manner regulation that is

narrowly-tailored to meet the State's *significant interests in public safety and

preservation of the public resource* that is Capitol Park") (emphasis added);[8] *cf. also

Naturist Soc., Inc. v. Fillyaw*, 858 F. Supp. 1559, 1567-68 (S.D. Fla. 1994) (agreeing

that "providing park visitors with a unique recreational experience based on the natural

environment" is a significant state interest, where the park "was purchased in order to

preserve the undeveloped natural beauty of the Florida landscape for the enjoyment of

citizens and tourists").

  Having concluded that the asserted interests are significant government interests,

the Court considers whether the Park Closure Law is narrowly tailored to meet those

interests—in other words, whether "the means chosen are not substantially broader than

---

   [8] Capitol Park is a park in Augusta, Maine, that is situated across from the Maine State Capitol buildings and the governor's residence, and where Occupy Augusta sought to camp. *See Freeman*, 2011 WL 6139216, at *2.

necessary to achieve the government's interest," *Ward*, 491 U.S. at 800; there must be a "reasonable fit" between the cited interests and the law at issue, *CAMP*, 219 F.3d at 1318 (citing *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 416 (1993)).  Plaintiffs offer numerous arguments in an attempt to poke holes in the fit between the cited interests and the Park Closure Law, [Doc. 37 at 12-14], and while some of these contentions may be compelling in the abstract, the persuasiveness of these arguments is ultimately only superficial because the Supreme Court's opinion in *Clark* overcomes them.

In *Clark*, the National Park Service issued a permit to the Community for Creative Non-Violence ("CCNV") to conduct a demonstration in Lafayette Park and the National Mall—in the heart of Washington, D.C.—to demonstrate the plight of the homeless.  *Clark*, 468 U.S. at 291-92.  The CCNV was authorized to erect to symbolic tent cities but was prohibited from "camping," which among other things encompassed sleeping, storing personal belongings, making fires, or cooking.  *Id.* at 290-91, 292. The CCNV contended that the regulations were unconstitutionally vague, had been discriminatorily applied, and could not be applied to prevent sleeping in the tents without violating the First Amendment.  *Id.* at 292.  The Supreme Court disagreed. It assumed without deciding that sleeping in connection with a demonstration was

40

expressive conduct protected to some extent by the First Amendment, *id.* at 293, but it

found that this conclusion did not

> render the sleeping prohibition any less a time, place, or manner
> regulation.  To the contrary, the Park Service neither attempts to ban
> sleeping generally nor to ban it everywhere in the parks.  It has
> established areas for camping and forbids it elsewhere, including
> Lafayette Park and the Mall.  Considered as such, we have very little
> trouble concluding that the Park Service may prohibit overnight sleeping
> in the parks involved here.

*Id.* at 295.  The Supreme Court agreed that the government had a "substantial interest

in maintaining the parks in the heart of our Capital in an attractive and intact

condition," and concluded that "[t]o permit camping—using these areas as living

accommodations—would be totally inimical to these purposes." *Id.* at 296.  The CCNV

contended that the "incremental benefit to the parks" could not justify a total ban on

sleeping if the demonstrators did not intend to engage in other aspects of camping (such

as cooking), but the Supreme Court rejected this argument as well.  *Id.*  First, the Court

said, "we seriously doubt that the First Amendment requires the Park Service to permit

a demonstration in Lafayette Park and the Mall involving a 24–hour vigil and the

erection of tents to accommodate 150 people." *Id.*  The sleeping ban, it noted, would

"effectively limit the nature, extent, and duration of the demonstration and to that extent

ease the pressure on the parks," given the "facilitative" nature of the ability to sleep

41

(it would ensure greater participation by the homeless in the demonstration). *Id.*

Second, the Supreme Court noted that "the validity of this regulation need not be

judged solely by reference to the demonstration at hand."  *Id.* at 296-97.

> With the prohibition, however, as is evident in the case before us, at least
> some around-the-clock demonstrations lasting for days on end will not
> materialize, others will be limited in size and duration, and the purposes
> of the regulation will thus be materially served.  Perhaps these purposes
> would be more effectively and not so clumsily achieved by preventing
> tents and 24-hour vigils entirely in the core areas.  But the Park Service's
> decision to permit nonsleeping demonstrations does not, in our view,
> impugn the camping prohibition as a valuable, but perhaps imperfect,
> protection to the parks.

*Id.* at 297.

In the undersigned's view, *Clark* resolves this case.  Plaintiffs contend that the

law upheld in *Clark* was much less restrictive, [Doc. 37 at 11-12], but the Supreme

Court made no intimations that its broad statements would be any less applicable to

somewhat broader laws; in this last passage quoted above, it arguably suggested that

even a much broader prohibition would be constitutional: "Perhaps these purposes

would be more effectively and not so clumsily achieved by preventing tents and

24-hour vigils entirely in the core areas."  *Clark*, 468 U.S. at 297.  Further, the Park

Closure Law is limited to public parks—leaving open other public property—and only

applies for seven hours, 11:00 a.m. to 6:00 p.m., leaving seventeen hours per day for

42

Plaintiffs to engage in expressive activity. Plaintiffs wish to engage in twenty-four-hour protests in Woodruff Park, but clearly the City may place some restrictions on hours; otherwise the phrase "*time*, place, and manner restrictions" would make no sense. Notably, the Park Closure does not prohibit from Plaintiffs from engaging in twenty-four-hour expressive activity related to the goals of Occupy Atlanta; it only prohibits them from doing so *in public parks* for seven late-night and early-morning hours. *See Occupy Sacramento*, --- F. Supp. 2d. at ----, 2012 WL 2839853, at *9 (noting—in the narrow-tailoring analysis—that "[t]he ordinance is limited to City parks and limited to five or six hours a day between the hours of 11:00 p.m. and 5:00 a.m."). The Park Closure law may not be perfect at achieving all of the City's goals, but that is not the inquiry. For example, there is undoubtedly noise and occasional crime occurring just outside of Woodruff Park during the closed hours, but that would not lessen the City's interest in decreasing those things within the Park itself. And while a large multi-day festival might cause much more wear to the Park than would the fewer visitors who might visit the Park in the middle of the night (were the Park Closure Law not in effect), that does not mean that the Park Closure Law does not serve the City's interest in maintaining the Park. The hours restriction "thus effectively limit[s] the nature, extent, and duration" of activity in

43

public parks "and to that extent ease[s] the pressure on the parks." *Clark*, 468 U.S. at 296.  Even acknowledging that many public parks in Atlanta "consist largely of concrete sidewalks and are not covered by grass," (Second Am. Compl. ¶ 52), and "are open to view from all sides and any activity taking place therein can be seen from any nearby street or sidewalk, (*id.* ¶ 53), does not resolve the narrow-tailoring inquiry, because to uphold the law the Court need only conclude that "the means chosen are not substantially broader than necessary to achieve the government's interest," *Ward*, 491 U.S. at 800; "it need not be the least restrictive or least intrusive means of doing so," *id.* at 798.  It may be true that "many" of Atlanta's "at least 343" public parks, (Second Am. Compl. ¶ 48), may not pose the same maintenance and public-safety problems as Woodruff Park, but the undersigned finds no basis for concluding that the Park Closure Law is *substantiall*y broader than necessary to achieve its interests in maintenance, noise reduction, safety, and crime reduction, in all of its public parks.  As stated, the Park Closure Law only prohibits access for seven hours per day, and it does not limit expressive activity outside of the relevant parks.   *See Occupy Sacramento*, --- F. Supp. 2d. at ----, 2012 WL 2839853, at *9.

For all these reasons, the undersigned concludes that the Park Closure Law is narrowly tailored to achieve significant government interests.

44

### iii.     Alternative Channels of Communication

The undersigned now considers whether the Park Closure Law leaves open ample alternative channels for communication.

The City notes that the Park Closure Law disallows park use for only seven hours per day and that the surrounding sidewalks may be used at any time. [Doc. 36 at 18]. With respect to the sidewalks argument, Plaintiffs respond that Atlanta's Code prohibits obstructing sidewalks, bans erecting tents, prohibits sitting or lying down in the street, and requires a permit before attaching banners to certain fixtures; that protests are banned near certain government properties; that the disorderly-conduct ordinance only prevents *conviction* if the predominant intent of the conduct is to exercise a constitutional right, not arrest; and that the ability to remain in the Park overnight is integral to Plaintiffs' political expression. [Doc. 37 at 15-18]. With respect to the argument pertaining to hours, Plaintiffs state that there is no late-night public forum for a variety of First Amendment activities, that their speech should receive more protection than adult-entertainment establishments, and that it should not be difficult for the City to draft an ordinance that does not ban all speech in public parks during certain hours yet still alleviates concerns about keeping the parks safe and in good condition. [*Id.* at 19-21]. In reply, the City states that Plaintiffs' arguments are

45

disproved by the continued after-hours demonstrations on the City's sidewalks (at the time of the City's filing); that the relevant question in any event is whether the City *allowed* protesters to relocate to the sidewalks; that sidewalks abutting a park provide greater opportunity to be heard after-hours; that *Smith v. Fort Lauderdale, Florida*, 177 F.3d 954 (11th Cir. 1999), is analogous to this case; and that Plaintiffs' arguments regarding various Atlanta Code provisions are unpersuasive. [Doc. 38 at 7-11].

The undersigned agrees with the City that the Park Closure Law leaves open ample alternative channels for communication. That is not to say that the Court adopts all of the City's arguments, however. The Court does not find useful the City's assertion that Occupy Atlanta protests on the sidewalk abutting Woodruff Park when the Park closes. This statement was made in a reply brief and is not supported by an affidavit, reference to the Second Amended Complaint, or any other appropriate source. As such, the Court will not consider it. *See* LR 7.1A(1), NDGa ("If allegations of fact are relied upon, supporting affidavits must be attached to the memorandum of law."). Further, the undersigned finds that the City's reliance on *Smith v. Fort Lauderdale, Florida* is not entirely appropriate. In that case, the Eleventh Circuit found that "suppression of begging in the Fort Lauderdale Beach area is materially mitigated by the allowance of begging in streets, on sidewalks, and in many other public fora

46

throughout the City." *Smith*, 177 F.3d at 956-57.  By its very terms, however, that was not an ample-alternative-channels case but a narrow-tailoring one.  *See id.* at 956 ("Plaintiffs do not dispute that Rule 7.5(c) is content-neutral and leaves open ample alternative channels of communication.  Plaintiffs also expressly concede that the City's interest in providing a safe, pleasant environment and eliminating nuisance activity on the beach is 'a significant government interest.'  Plaintiffs argue only that Rule 7.5(c)'s begging restrictions are not narrowly tailored to serve that interest.  We disagree.").  It may be somewhat telling that the plaintiffs in that case did not dispute the ample-alternative-channels element, but this says nothing about the Eleventh Circuit's view on that point.  It may well be very likely that the Eleventh Circuit would cite the same reasons in an ample-alternative-channels analysis as it did in its narrow-tailoring analysis, but the undersigned will not read into the opinion that which was explicitly excluded from it.

Nevertheless, the undersigned concludes that there were ample alternative channels available in this case.  Most notably, Plaintiffs may use most of the centrally located sidewalks in Atlanta, including those abutting Woodruff Park.  The City's disorderly-conduct ordinance specifically forbids blocking pedestrian traffic on a sidewalk, *see* Code Section 106-81(8), (9), but that ordinance also states that "no person

47

shall be convicted of any of the following sections upon a showing that the predominant intent of such conduct was to exercise a constitutional right," *see* Code Section 106-81. Plaintiffs appear to contend that this would nevertheless allow them to be arrested, [Doc. 37 at 17], but the undersigned agrees with the City that it may not arrest Plaintiffs for engaging in lawful conduct (at least not without opening itself up to civil liability, *see Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996) ("A warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim.")). Thus, in addition to the seventeen hours per day that Plaintiffs may engage in expressive activity in Woodruff Park, the abutting sidewalks are available to them twenty-four hours per day. The undersigned is therefore not persuaded by the argument regarding restrictions with respect to certain government-owned properties such as detention facilities, or the argument that "[t]he ability to remain in a park overnight and after-hours, where signs, tents, tables, displays, and exhibits can be erected and maintained, is integral to type of political expression seen in this case," [Doc. 37 at 18]. The sidewalks abutting Woodruff Park undoubtedly do not provide the same communal environment that Occupy Atlanta seeks to foster, but that genuine inconvenience does not establish a First Amendment claim: "The Constitution requires only that Atlanta leave open *an* alternative channel of

48

communication, not the alternative channel of communication [Plaintiffs] desire[].”

*CAMP Legal Defense Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1282 (11th Cir. 2006) (emphasis in original).

Because there are numerous centrally located sidewalks on which Plaintiffs may engage in protected activity, the Court concludes that the Park Closure Law leaves open ample alternative channels for communication.[9]

─────────────────

[9]     The undersigned is not persuaded by Plaintiffs' analogy to the adult-entertainment context. Plaintiffs state that political protesters deserve more First Amendment protection than adult entertainment, and they note that in *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1365 (11th Cir. 1999), the Eleventh Circuit called the constitutionality of a particular restriction on the hours of operation of a strip club a “close question.” [Doc. 37 at 20-21]. The restriction in that case, however, was *upheld*. Neither defense counsel nor the Eleventh Circuit itself could come up with a reason why the City of Jacksonville required adult-entertainment establishments to close from 10:00 a.m. until noon (the ban was actually from 2:00 a.m. to noon, but the plaintiffs limited their argument to 10:00 a.m. to noon), but the court nevertheless concluded that the provision *as a whole* served a substantial government interest, was narrowly tailored because the hours-of-operation rule was “not substantially broader than necessary,” and left open reasonable alternative avenues of expression because adult businesses could stay open for fourteen hours per day, seven days per week. *Lady J. Lingerie*, 176 F.3d at 1365. It is not clear how this case supports the conclusion that the Park Closure Law here is unconstitutional, particularly given that the Park Closure Law is *less* restrictive than the regulatory regime in *Lady J. Lingerie*, since the Park Closure Law permits activity in Woodruff Park for seventeen hours per day (versus the fourteen hours in *Lady J. Lingerie*). It may well be the case that “the [Supreme] Court has indicated the government has more latitude to regulate sexually oriented speech,” Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 1048 (4th ed. 2011), but that does mean that all restrictions on political protests are invalid. If anything, *Lady J. Lingerie* supports the undersigned's conclusion, not Plaintiffs'. And Plaintiffs

### d.      Conclusion

Because Code Section 110-60(a)—the Park Closure Law—is content neutral, is narrowly tailored to achieve a significant government interest, and leaves open ample alternative channels of communication, the Court cannot conclude that it is an unconstitutional time, place, and manner restriction.  Because—for the reasons discussed above—the Park Closure Law survives as applied to Plaintiffs, Plaintiffs' facial challenge necessary fails as well.  *See United States v. Jones*, No. 11-13882, 2012 WL 2756109, at *2 (11th Cir. July 10, 2012) ("In contrast to a facial constitutional challenge, which asserts that a law always operates unconstitutionally, an as-applied challenge addresses whether a statute is unconstitutional on the facts of a particular case or to a particular party." (quoting *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009))) (internal quotation marks omitted).[10]  The City's

---

did not even attempt to reconcile their reasoning with the Supreme Court's decision in *Clark*.  Plaintiffs' reading would seem to suggest that *Clark* was wrongly decided, an argument that the undersigned obviously may not entertain.

[10]      The parties do not discuss the difference between facial and as-applied challenges, and this difference was evidently not a dominant concern for either side with respect to Count One.  Although the Second Amended Complaint unequivocally indicates that Count One is brought as both a facial and an as-applied challenge, (Second Am. Compl. at 13 (asserting that Code Section 110-60 "is an impermissible time, place, and manner restriction on its face and as applied to Occupy Atlanta")), the word "applied" does not appear even once in Plaintiffs' response to the motion to

AO 72A
(Rev.8/8
2)

motion to dismiss is therefore **GRANTED** with respect to this claim, and the claim is **DISMISSED**.

### B.    Count Two: Overbreadth Challenge to the Park Closure Law

#### 1.    Arguments of the Parties

In its motion to dismiss, the City argues that the Park Closure Law is not overbroad.  [Doc. 36 at 19-21].  In particular, the City states that the Park Closure Law addresses conduct only, not speech or conduct necessarily associated with speech, and thus the provision is not overbroad.  [*Id.* at 21].  The City references its earlier arguments regarding the City's significant interests in regulating the hours of park use and its arguments regarding narrow tailoring to protect those interests, and the City contends that countless cases have upheld the constitutionality of restrictions on park use, including restrictions on the hours of use.  [*Id.*].

In response, Plaintiffs state that it is not true that the Park Closure Law addresses only conduct, but rather the provision bans *all* forms of after-hours speech in public

---

dismiss, and the word "facial" makes only one appearance in the section addressing Count One: the heading to that section alleges that the Park Closure Law "is facially unconstitutional because it is not a valid time, place, and manner restriction," [Doc. 37 at 6].  In the analysis of Count One above, the undersigned has addressed the Park Closure Law as applied to Plaintiffs.  Because the Law is upheld as applied to Plaintiffs, the facial challenge necessarily fails as well.

51

parks.  [Doc. 37 at 22].  Plaintiffs further state that they rely on the arguments above in support of the contention that the provision burdens substantially more speech than necessary when compared to its legitimate sweep.  [*Id.*].

In reply, the City refers back to the arguments made in its motion to dismiss. [Doc. 38 at 7 n.3].

### 2.    Analysis

"On First Amendment overbreadth grounds, a law is facially invalid if it punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep."  *Curves, LLC v. Spalding Cnty., Ga.*, 685 F.3d 1284, 1290 (11th Cir. July 6, 2012) (internal quotation marks omitted) (quoting *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003), and *Broadrick v. Oklahoma*, 413 U.S. 601 (1973)).  Such a showing "suffices to invalidate all enforcement of that law, 'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.' "  *Hicks*, 539 U.S. at 119 (quoting *Broadrick*, 413 U.S. at 613).  The Court "must keep in mind," however, "that invalidating a law for overbreadth is 'strong medicine,' " and is "extraordinarily rare." *Catron v. City of St. Petersburg*, 658 F.3d 1260, 1269-70 (11th Cir. 2011) (quoting *Hicks*, 539 U.S. at 113).

AO 72A
(Rev.8/8
2)

The Court concludes that Plaintiffs' overbreadth challenge fails. The undersigned agrees with Plaintiffs that the Park Closure Law addresses not only conduct but all speech—after all, because the provision prohibits *being* in Woodruff Park after-hours, *see* Section 110-60(a), it necessarily prohibits all after-hours speech. But Plaintiffs have not explained how this fact establishes an overbreadth claim. Instead, to establish their claim, Plaintiffs state that they "rely on those arguments articulated above in support of the contention that § 110-60(a) burdens substantially more speech than necessary when compared to its legitimate sweep." [Doc. 37 at 22]. The undersigned has rejected those arguments. *See supra* Part IV.A.2.c.ii. There is thus little else that can be said of the overbreadth claim in this case, except that Plaintiffs have not established it. The Court therefore **GRANTS** the City's motion to dismiss with respect to Plaintiffs' overbreadth claim, and **DISMISSES** that claim.

### C.      Count Three: Constitutionality of the Executive Orders

In Plaintiffs' Second Amended Complaint, Count Three is accompanied by the heading, "Ability of the Mayor to suspend enforcement of Section 110-60 to allow for after-hours speech and protest constitutes an unlawful prior restraint." (Second Am.

Compl. at 15).[11]  Plaintiffs also contend that EO 2011-3 "constituted a permit to engage in constitutionally protected speech."  (*See id.* ¶ 72).  The Court will thus address whether the Mayor's "[a]bility . . . to suspend enforcement of Section 110-60" constitutes a prior restraint.

### 1.    Arguments of the Parties

In its motion to dismiss, the City states that Occupy Atlanta never had a permit to "engage in constitutionally protected speech" and that EO 2011-4 was issued to alleviate compelling and immediate public-safety risks.  [Doc. 36 at 21-25].  The City argues that the prior executive order, EO 2011-3, was not a permit and did not authorize a particular form of speech or expression.  [*Id.* at 23].  The City states that while EO 2011-3 referenced the activities of Occupy Atlanta to explain the compelling interest being addressed, the Order applied to all people in Woodruff Park, not solely to members of Occupy Atlanta, and thus Plaintiffs' argument that EO 2011-3 "constituted a permit [to Occupy Atlanta] to engage in constitutionally protected speech" is a mischaracterization of the plain language of the Order.  [*Id.*].  The City

---

[11]    Thus, contrary to the City's contentions, [Doc. 36 at 24 ("Plaintiffs do not challenge the Mayor's authority to issue [EO 2011-3].")], the thing being challenged as an unlawful prior restraint is the *ability* of the Mayor to suspend enforcement of the Park Closure Law—in the other words, the ability of the Mayor to issue Executive Orders 2011-2 and 2011-3.

contends that the sole purpose of EO 2011-3 was to stay enforcement of the Park Closure Law; the Order was issued based on a "compelling public safety need" that was "substantially related to the public health, safety and welfare"; and it did not apply only to Occupy Atlanta, did not authorize any specific conduct other than being in the Park, and did not give Occupy Atlanta any particular rights with respect to the Park.  [*Id.* at 23-24].  According to the City, because Occupy Atlanta never had a permit, their claim that their "permit" cannot be revoked unless the discretion of City officials is controlled by defined standards is fundamentally flawed.  [*Id.* at 24].

Finally, the City argues that even assuming that Plaintiffs had a City-issued permit, a claim that the revocation was arbitrary is overwhelmingly contradicted by the facts set forth in Plaintiffs' Second Amended Complaint.  [Doc. 36 at 25].  The City states that the Mayor's decision to revoke EO 2011-3 was not arbitrary because it was revoked due to compelling public-safety reasons, noted both in EO 2011-4 itself and Exhibit H to Plaintiff's Second Amended Complaint, [Doc. 34-9 ("Atlanta Press Release Announcing Arrests")].  [Doc. 36 at 24-25].

In response, Plaintiffs state that the City acknowledges that the executive order could be revoked for any reason, and numerous cases show that virtually any discretion is suspect.  [Doc. 37 at 23].  Plaintiffs argue that Mayor Reed's power to enter an

55

executive order is limited only to issuing "executive orders which may apply to events of short duration"; they reject as absurd the City's purported argument that the long line of cases limiting an official's discretion to deny speech rights should be ignored because the City has not implemented a permitting scheme, stating that this would mean that municipalities could avoid the First Amendment by simply removing permitting procedures and relying on a mayor's executive authority to determine whether to permit speech. [*Id.* at 23-24 & 24 n.35]. Plaintiffs contend that while Mayor Reed initially allowed Occupy Atlanta to remain in the park, there is nothing that requires him to allow another political group to hold a similar protest, and nothing to prevent him from dispersing an overnight protest if the group's message is politically inconvenient. [*Id.* at 24-25]. For this reason, Plaintiffs argue that Mayor Reed's ability to issue an executive order to allow certain speech, in lieu of a valid permitting scheme, is an unconstitutional prior restraint. [*Id.* at 25].

In reply, the City states that Plaintiffs' argument regarding executive orders wrongly characterizes Executive Orders 2011-2, 2011-3, and 2011-4 as directives pertaining to speech. [Doc. 38 at 11]. Instead, the City contends, the Executive Orders were directives regarding enforcement of the Park Closure Law in Woodruff Park and were based on extreme public-safety concerns; the Orders impacted every person

56

wanting to remain in Woodruff Park after-hours. [*Id.* at 12]. The City states that the City regulates outdoor events through Chapter 142 of the Code ("Outdoor Events Ordinance"), which sets forth objective, content-neutral criteria to determine whether permit requests will be approved, and the constitutionality of which is not challenged by Plaintiffs. [*Id.* at 12-13]. According to the City, the issue before Mayor Reed was whether people could remain in Woodruff Park after-hours, not whether specific demonstrations should be permitted; the Executive Orders did not mention the Outdoor Events Ordinance or permitting, did not waive enforcement of the Outdoor Events Ordinance, and did not issue a permit to Occupy Atlanta in a manner not authorized by the Outdoor Events Ordinance. [*Id.* at 13-14]. The City emphatically argues that the Orders did not pertain to outdoor event permitting at all, and even granting an event permit to Occupy Atlanta would not have addressed after-hours use of Woodruff Park because event permits do not override the Park Closure Law. [*Id.* at 14]. Because, according to the City, there was never a dispute about whether Occupy Atlanta could lawfully demonstrate in the Park, Mayor Reed had no reason to issue an order about event permitting. [*Id.*]. The City contends that the cases cited by Plaintiffs pertain to permitting schemes that are found unconstitutional because of the amount and type of

57

discretion provided by decisionmakers but that those cases are inapplicable here because this case does not involve permitting.  [*Id.* at 14-15].

## 2.   Analysis

"  'A prior restraint of expression exists when the government can deny access to a forum before the expression occurs.' "  *Bourgeois v. Peters*, 387 F.3d 1303, 1319 (11th Cir. 2004) (quoting *Frandsen*, 212 F.3d at 1236-37); *see also Get Outdoors II, LLC v. City of San Diego, Cal.*, 506 F.3d 886, 894 (9th Cir. 2007) ("The Supreme Court has espoused two definitions of a prior restraint: an ordinance that vests unbridled discretion in the licensor, or an ordinance that does not impose adequate time limits on the relevant public officials[.]") (internal citations omitted).  "Although prior restraints are not *per se* unconstitutional, there is a strong presumption against their constitutionality."  *Frandsen*, 212 F.3d at 1237.  "The First Amendment prohibits prior restraints on speech unless they 'meet the requirements for reasonable time, place and manner restrictions of protected speech in public fora.' "  *CAMP Legal Defense Fund, Inc.*, 451 F.3d at 1280 (quoting *CAMP*, 219 F.3d at 1316)); *accord Advantage Adver., LLC v. City of Hoover, Ala.*, 200 Fed. Appx. 831, 834 (11th Cir. Aug. 11, 2006) ("To be constitutional, a prior restraint of speech must satisfy three requirements: the restriction 'must be (1) content-neutral, (2) narrowly tailored to serve a significant

government interest, and (3) leave open ample alternative channels for communication of the information.' " (quoting *CAMP Legal Defense Fund*, 451 F.3d at 1280)).  "[A] licensing or permit system is a classic form of prior restraint."  Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 1174 (4th ed. 2011).

The undersigned concludes that Mayor Reed's authority to suspend the Park Closure Law is not an unlawful prior restraint because it is not a prior restraint at all. Code Section 2-182 ("Powers of mayor in addition to other powers in Charter and Related Laws") may superficially resemble an unlawful prior restraint, given that it vests Mayor Reed with the sole and seemingly unbounded discretion to issue executive orders of the nature of EO 2011-3, but the Court nevertheless concludes that it is not, for several reasons.  First, as noted above, a prior restraint exists "when the government can deny access to a forum before the expression occurs," *Bourgeois*, 387 F.3d at 1319 (internal quotation marks omitted), yet it is not Code Section 2-182 that denies Plaintiffs the ability to protest after-hours in Woodruff Park; it is Code Section 110-60(a)—the Park Closure Law—and the undersigned has above upheld that provision against Plaintiffs' First Amendment challenges.  Second, and relatedly, there was no true "restraint," and to the extent there was, such restraint was not "prior."  As stated, Code Section 2-182 does not itself prohibit Plaintiffs' from engaging in after-

AO 72A
(Rev.8/8
2)

hours expressive activity in Woodruff Park; the Park Closure Law does that.  Code Section 2-182 merely authorizes Mayor Reed to—among many other things—suspend the Park Closure Law in Plaintiffs' favor.  Plaintiffs' expressive activity in Woodruff Park began well before Mayor Reed suspended the Park Closure Law and continued after the suspension was revoked.  Their speech in Woodruff Park does not appear to have been subjected to any permitting system, and in any event they were allowed to conduct their expressive activity.[12]  For this same reason, any restraint was not "prior" restraint.  Plaintiffs were already conducting their expressive activity in Woodruff Park before they were allowed to continue *that same expressive activity* after-hours, and it was only after conducting their desired speech after-hours that they were told they could not longer do so.  *Cf. Bench Billboard Co. v. City of Toledo*, 690 F. Supp. 2d 651, 661 n.3 (N.D. Ohio 2010) ("[P]rovisions governing revocation of permits do not implicate the prior restraint doctrine, because, by definition, revocation occurs *after* the permit has been issued.").  In sum, Code Section 2-182 is not an unlawful prior restraint, nor were Plaintiffs otherwise subjected to one.

---

[12]    It is true that they were not permitted to continue engaging in protected speech at all of the times they wished, but the undersigned has above explained why this does not pose a constitutional problem, *see supra* Part IV.A.2.c.ii, iii.

Because the Court has concluded that Plaintiffs were not subjected to an unlawful prior restraint, the Court has also implicitly resolved the question whether EO 2011-3 constituted a "permit" for Plaintiffs to engage in after-hours expressive activity in Woodruff Park: because a permitting scheme is a system of prior restraint, and because Code Section 2-182 is not a prior restraint, Mayor Reed logically could not have been acting pursuant to an alternative permitting scheme, and EO 2011-3 cannot be a "permit." Although the Court therefore need not further discuss the issue, the Court will nevertheless explain why Plaintiffs' arguments on that point are unpersuasive, independent of the above analysis.

First, EO 2011-3 is not reasonably characterized as a permit because it simply allowed Plaintiffs to continue doing what they were already doing, merely at a different time. There is no contention that their expressive activity during the daytime required a permit, and there is also no contention that the City's official permitting scheme would have permitted them to engage in twenty-four-hour expressive activity for an indefinite period. The Court also rejects Plaintiffs' contention that the City's position means that the City could abolish its permitting scheme altogether and merely use executive authority of unbounded discretion to decide questions of licensing of expressive activity. That would obviously be an unlawful prior restraint. EO 2011-3

61

AO 72A
(Rev.8/8
2)

does not supplant the existing permitting scheme, and there is no contention that the permitting scheme in place is unconstitutional (except to the extent that the Park Closure Law is contended to be a part of that scheme, but the undersigned has concluded that that provision is constitutional under the First Amendment).  For these reasons, EO 2011-3 was not a "permit" to engage in expressive activity, even if it literally *permitted* Plaintiffs to be in Woodruff Park after-hours.

For all of these reasons, the undersigned concludes that Plaintiffs' claim regarding an unlawful prior restraint fails.  The Court therefore **GRANTS** the City's motion to dismiss with respect to that claim, and **DISMISSES** the claim.[13]

## VI.    Conclusion

For the reasons above, the City of Atlanta's motion to dismiss the Second Amended Complaint is **GRANTED**, [Doc. 36], and Plaintiffs' action is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**, this the 30th day of August, 2012.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

_____

[13]     The undersigned's dismissal of this claim is not intended to endorse all of the arguments made by the City with respect to this claim.

AO 72A
(Rev.8/8
2)